THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL A. SHEVOCK, Defendant-Appellant.

Fourth District   No. 4—00—0548

Opinion filed January 8, 2003.

Daniel D. Yuhas and Judith N. Lozier, both of State Appellate Defender's Office, of Springfield, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

A jury convicted defendant, Paul A. Shevock, of unlawful possession of a methamphetamine manufacturing chemical with the intent to manufacture methamphetamine (720 ILCS 570/401(a)(6.6)(A) (West 2000)). The trial court sentenced him to a 10-year prison term. Defendant appeals, contending that (1) he was not found guilty beyond a reasonable doubt and (2) the trial court erred in admitting into evidence content labels on over-the-counter medication boxes in violation of the rule against hearsay. We affirm.

## I. BACKGROUND

Officer Geoffrey Coon of the Champaign police department testified that in the early morning hours of January 10, 2000, he was on duty and patrolling the area near the Microtel Inn in Champaign, Illinois. He patrolled that area frequently due to numerous recent calls on drug activity and fights. That morning he noticed a car backed into a parking spot in a corner near a garbage Dumpster, away from other vehicles. The car did not have a front license plate. He looked in the vehicle and discovered two red plastic gas containers, a white plastic bag with three one-gallon size Igloo-type coolers and numerous hanging and bottled air fresheners. He noted a Tennessee rear license plate. He compared the room registration with the license-plate registration and found two different names. He discussed his findings with other officers, and the drug task force was notified.

Members of the task force came to defendant's room. Defendant cooperated with the officers in the search of his room and his car. The evidence at trial was uncontradicted that defendant possessed 23 boxes of Sudafed antihistamine medication, two canisters of salt, razor blades, pipes, tubes, valves, a glass jar wrapped in duct tape, Mason jars with lids, a pan, a funnel, coffee filters, a turkey baster, lithium batteries, a hot-plate heating coil, and starter fluid. All of these items were in his motel room. Police also found a chunky substance wrapped in tinfoil, which was later identified as methamphetamine. Defendant's automobile contained several one-gallon size thermal bottles and several types of air fresheners, confirming what Officer Coon had seen.

Illinois State Police special agent William Kroncke testified he was certified by the federal Drug Enforcement Administration as a clandestine methamphetamine laboratory specialist. He has been involved in at least 50 investigations involving clandestine methamphetamine labs, and during his certification training he was required to "cook" a batch of methamphetamine. He stated the items necessary to manufacture methamphetamine include lithium, usually obtained from camera batteries; anhydrous ammonia, a highly dangerous and strong-smelling liquid that needs to be handled with surgical-type masks and gloves and that is usually obtained from farmers, who use it as fertilizer; pseudoephedrine or ephedrine, found in over-the-counter cold medications; starting fluid; salt; coffee filters; various plastic containers used for storing chemicals such as anhydrous ammonia; clear plastic tubing; and a heating source. The manufacturing process included a chemical reaction between the anhydrous ammonia and the lithium combined with the pseudoephedrine or ephedrine after being heated. Salt was also used in the formula. Tubing and filters as well as a turkey baster were necessary to remove impurities from the resulting methamphetamine.

Agent Kroncke was present in defendant's motel room and stated he believed, due to the contents of the room, it could have been a clandestine methamphetamine laboratory. Agent Kroncke further stated there is a formula used to predict how much methamphetamine could be yielded from a certain quantity of Sudafed. The amount of Sudafed defendant possessed would yield between 33 and 51 grams of methamphetamine.

The label of a box of Sudafed stated its active ingredient was pseudoephedrine. The box was admitted into evidence over defendant's objection.

Officer Scott Swan testified defendant told him at the time his motel room was searched there might be a couple items in the room that would test positive for methamphetamine residue. Further evidence at trial included the fact defendant was a parole violator from Tennessee and registered at the motel under an assumed name.

Defendant sought a directed verdict, based in part on the court's erroneous admission of the Sudafed box and label. The trial court denied the motion.

Defendant testified he was from Tennessee and had come to Champaign to look for work. As he was between jobs, he had moved out of his house and moved all of his belongings to the house of a friend for storage. During his last trip through his house, he loaded the last bit of odds and ends left into the trunk of his car. He had then traveled to Champaign.

Defendant explained that in addition to the items enumerated in the State's testimony, he also had with him a flashlight, a coffee pot, silverware and kitchen utensils, clothing and personal hygiene items, towels, three cartons of cigarettes, and seven four-packs of Boost, a nutritional supplement drink. He denied having manufactured methamphetamine or knowing how to do so. He admitted he purchased some in Tennessee and then smoked some while on the trip to Illinois. Defendant admitted being on parole in Tennessee and, because he could not legally leave the state, he used a false name while checking into the motel.

Defendant then gave explanations for his possession of each of the items that the State maintained were necessary for the manufacture of methamphetamine. He explained the Sudafed was for personal use as he took handfuls of it daily to keep himself awake because he had a fear of sleeping and not waking up. This fear arose after experiencing the implantation of a pacemaker when he was found unconscious by a friend following a long period of sleep and unconsciousness. If the friend had not discovered him, he was told by the doctors, he likely would not have survived. The medical condition was documented in the record.

Defendant testified the amount of Sudafed found was a month's supply. In addition, he had a large quantity of cigarettes and testified he smoked a pack a day. He also possessed a large amount of Boost. Defendant stated he buys items that he uses regularly in bulk even though he is between jobs and money is tight. The Sudafed box contained a warning against the use of the product by a person with heart disease, high blood pressure, diabetes, or thyroid disease unless directed by a doctor. Defendant denied having a heart disease. He knew he took more than the recommended dosage but claimed to have no ill effects from his overuse of Sudafed.

Defendant further stated he possessed the salt to defrost the windshield of his car in the morning, as the weather was freezing rain and sleet that night and, since the windshield already had a crack in it, he did not want to crack it further by thawing it with warm water.

Defendant stated the razor blades were to shave and make himself presentable for his job search in the morning. The pipes, tubes, valves and jars were related to an aboveground swimming pool that he moved to his friend's house. They were in the utility room of his house and he simply stuffed them into a duffel bag he usually used for clothes. He had brought the duffel bag into the motel room by mistake, thinking it contained a change of clothes. The pan and funnel were to change oil in his car because it leaked. The batteries were for his flashlight; he bought lithium batteries because they lasted longer. The starter fluid was for his stepfather, who was a trucker, and defendant was meeting him for dinner in the Chicago area the next day. His stepfather needed starter fluid for his semi-truck during freezing weather. Defendant stated because he was in the middle of a move, he had thrown last-minute items into the trunk of the car or into the duffel bag.

Defendant testified the duct tape was wrapped around the Mason jar to keep it from breaking. Liquid had been in the jar when discovered by the police but it had been poured out. Defendant claimed it was chorine left from his pool. The empty gallon containers found in the car were for filling with water to fill the leaking radiator.

On this evidence, a jury convicted defendant and the trial court denied his posttrial motion, in which defendant renewed his objection to the admission of the Sudafed box and label, and sentenced him as stated. This appeal followed.

## II. ANALYSIS

### A. Sudafed Label as Inadmissible Hearsay

We first consider defendant's claim of error in the State's introduction into evidence of the boxes of Sudafed for proof Sudafed actually

contained, and defendant possessed, 5,520 milligrams of ephedrine or pseudoephedrine because it was so stated on the label. He maintains (1) the label on the box constituted hearsay and did not fit under the business records exception or any other recognized exception to the rule against hearsay; and (2) the State failed to present any witness to authenticate the pills, interpret the boxes' labels, or testify Sudafed pills were a necessary ingredient of a methamphetamine recipe.

■ The confrontation clause of the United States and Illinois Constitutions (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) permits hearsay evidence to be admitted against defendant only where the evidence falls within a firmly rooted hearsay exception or particularized guarantees of trustworthiness assure the reliability of the evidence. *People v. McClanahan*, 191 Ill. 2d 127, 132, 729 N.E.2d 470, 474 (2000), citing *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539 (1980).

The issue of whether a label on a box of over-the-counter medicine listing active ingredients comes within an exception to the rule against hearsay is a matter of first impression. In support of its argument the label was admissible as evidence, the State has cited an analogous case dealing with the admissibility of the label on a glue container to prove it contained a chemical that is a hazardous substance. In *In re T.D.*, 115 Ill. App. 3d 872, 450 N.E.2d 455 (1983), the court found the container did not fit the business records exception to the hearsay rule because no one identified the label, nor was there testimony it was produced in the routine course of business. *T.D.*, 115 Ill. App. 3d at 876, 450 N.E.2d at 457-58. However, the Second District did find the label was properly admissible because it was sufficiently reliable and trustworthy to be considered a hearsay exception. *T.D.*, 115 Ill. App. 3d at 876, 450 N.E.2d at 458. The label in question was required on the glue container under both state and federal law, subject to penalty, because the chemical in question was a hazardous substance. Therefore, the court concluded its trustworthiness was above suspicion and should be an exception to the rule against hearsay. *T.D.*, 115 Ill. App. 3d at 876-77, 450 N.E.2d at 458. The circumstances of the case, where the product had been purchased by the defendant and was in its original package, reducing the opportunity for tampering or adulteration, together with the statutory requirement that the product be labeled, combined to make the label admissible in spite of the hearsay rule. *T.D.*, 115 Ill. App. 3d at 878, 450 N.E.2d at 459.

■ We find the reasoning of the *T.D.* court and the authorities cited therein persuasive. In this case, the packages of Sudafed were unopened when confiscated from defendant. This reduced the opportunity for tampering or adulteration. In addition, section 15 of the

Illinois Food, Drug and Cosmetic Act (410 ILCS 620/15(e)(1)(A)(ii) (West 2000)) states a packaged drug formulated of more than two ingredients is misbranded if its label does not contain the name of each active ingredient. Violations of this act can result in criminal punishment and destruction of the product. 410 ILCS 620/5, 6 (West 2000). Thus, the same indicia of trustworthiness found in *T.D.* are present in this case, *i.e.*, the general rule on trade inscriptions applies—writing on a product's label is competent proof of its contents and is self-authenticating—and the labels found on the Sudafed boxes were properly admitted into evidence as within an exception to the rule against hearsay as substantive proof that Sudafed contained pseudoephedrine.

## B. Reasonable Doubt Challenge

Defendant argues he possessed items that are legal to own and have legitimate household uses and he explained why he had them with him. Further, he points out he did not have anhydrous ammonia or masks or gloves necessary for handling it, a necessary ingredient for the manufacture of methamphetamine. Defendant argues the absence of these items, despite the presence of pseudoephedrine and other ingredients for the manufacture of methamphetamine, means the evidence does not prove intent to manufacture on his part.

The State argues the presence of Sudafed and other relevant items for the manufacture of methamphetamine and the presence of methamphetamine in defendant's motel room led to the reasonable inference defendant possessed the requisite amount of methamphetamine manufacturing chemical (pseudoephedrine) with intent to manufacture to find a violation of section 401 of the Illinois Controlled Substances Act. 720 ILCS 570/401(a)(6.6)(A) (West 2000). The State contends this evidence alone was enough to find defendant guilty beyond a reasonable doubt.

■ When considering a defendant's challenge to the sufficiency of the evidence, the question for this court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Oaks*, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996). Proof beyond a reasonable doubt does not require the exclusion of every possible doubt, and a conviction may be sustained upon wholly circumstantial evidence if it leads to a reasonable certainty the defendant committed the crime. *People v. Cruz*, 129 Ill. App. 3d 278, 286, 472 N.E.2d 175, 180 (1984).

■ We find defendant did not have to prove his innocence: but if he chooses to give an explanation for the incriminating situation, he

should provide a reasonable story or be judged by its improbabilities. *People v. Gross*, 166 Ill. App. 3d 413, 421, 519 N.E.2d 1043, 1049 (1988). Defendant's inherently unbelievable story—coupled with his admitted possession of methamphetamine, possession of a relatively large amount of pseudoephedrine, the equipment, and most of the ingredients necessary for the manufacture of methamphetamine—was more than sufficient to permit the jury to find him guilty beyond a reasonable doubt.

## III. CONCLUSION

We affirm the trial court's judgment.

Affirmed.

TURNER and McCULLOUGH, JJ., concur.